# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Kevin Czech, (K90539),  )  <br> ) <br> Petitioner,  ) <br> ) <br> v.  ) <br> ) <br> ) <br> Michael Melvin, Acting Warden,  ) <br> ) <br> Respondent.  ) | Case No. 14 C 2012 <br><br> Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

This decision is a follow up to the court's August 3, 2016, opinion in Czech v. Pfister, No. 14 C 2012, 2016 WL 4158925 (N.D. Ill. Aug. 3, 2016). The court presumes the reader's familiarity with the August 3rd decision. In that decision, the court considered petitioner's 28 U.S.C. § 2254 habeas corpus petition (Dkt. 1) and denied petitioner's ineffective assistance of counsel arguments (Claims One and Three).

As to the remaining claim (Claim Two), the court concluded that petitioner's due process rights were violated when the jury returned a general verdict that may have relied upon an invalid legal theory. Id. at *10 (citing Yates v. United States, 354 U.S. 298 (1957)). The court called for additional briefing regarding whether the due process violation resulted in a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623 (1995) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Having reviewed the parties' additional briefing,[1] the court concludes that the constitutional error did not have a substantial and injurious effect or influence on the jury's verdict. Accordingly, Claim Two

---

[1] The Court thanks Messrs. James T. Malysiak and Aaron J. Hersh of Jenner & Block LLP for their *pro bono* representation of petitioner in the supplemental briefing on the Brecht issue.

is denied. The habeas corpus petition is denied on the merits. The court will issue a certificate of appealability.

**A.    Background**

    **1.    The Facts**

The following facts are repeated from the court's August 3, 2016, order and were initially drawn from the Illinois Appellate Court's opinion on direct appeal. Illinois v. Czech, No. 1-02-0982 (Ill. App. Ct. Mar. 31, 2004) (Rule 23 Order).[2] The state court findings are presumed correct, and petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. Brumfield v. Cain, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. 2254(e)(1)).

The case arises from petitioner's alleged orchestration of a gang related drive-by shooting on September 24, 1999. Czech, 2016 WL 4158925, at *1. Petitioner was a member of the Maniac Latin Disciples street gang, a rival of the Latin Kings street gang. Id. The shooting occurred in an area controlled by the Latin Kings. Id. The victim, a 14-year-old boy, was an innocent bystander, unaffiliated with either gang. Id.

Petitioner, Roberto Mejia, Marquis Falls, and Nancy Malaves were riding in a car together when the crime occurred. Id. at *2. Mejia, age 18, was dating Malaves, age 15. Petitioner was 20 years old, and Falls was 13. Id.

---

2 The state appellate court opinion on direct appeal provided by respondent is missing the final 13 pages. (Dkt. 10-1, pg. 6-25.) The full state court opinion is attached to the state postconviction petition that was included in the record. (Dkt. 10-4, pg. 42-74). The court has used that full copy of the state court opinion.

Both Malaves and Falls testified for the prosecution. Id. at *3. According to Malaves, the plan for the evening was for Mejia and her to have a double date at the movies with petitioner and his girlfriend. Id. When Malaves and Mejia picked up petitioner, he informed them that they were going to "cruise by the Kings," instead of going to the movies. Id. He also instructed them to pick up Falls. Id. Petitioner again stated they would be "cruising by some Kings," after the group picked up Falls. Id.

Approximately one month earlier, petitioner gave Falls a .357 revolver to hold for the gang. Id. Falls was considered a "pee wee" in the Maniac Latin Disciples because he was too young to be a full member. Id. As a pee wee, he earned "stars" by performing tasks for older gang members, such as holding guns for them. Id. Falls kept the .357 revolver hidden behind a garbage can in an alley, and checked on the gun daily. Id.

The group drove to the alley and retrieved the gun. Id. Falls gave the gun to petitioner when he returned to the car. (Dkt. 10-1, pg. 144). Falls testified at trial that petitioner stated "he needed a gun to shoot at" or "light up some Kings." (Dkt. 10-4, pg. 48). Falls further testified that petitioner told Falls that either he or Falls would shoot at the Latin Kings. Id. at 48-49. Petitioner's plan had Falls shoot at the Latin Kings if they were on his side of the car, while petitioner would perform the task if the rival gang members were on his side. Czech, 2016 WL 4158925, at *3.

The group drove to the Latin Kings' area where approximately 15 people, including the victim, were standing on the sidewalk on Falls' side of the car. Id. As they drove by, petitioner said, "King love," to the group, and made Latin King gang signs with his hands. Id. The men on

3

the sidewalk responded with "King love" and Latin King gang signs.  Id.  Petitioner also identified a ranking Latin King member, Chino, to Falls.   (Dkt. 10-1, pg. 146).

The car drove around the block and made a second pass by the men.  Czech, 2016 WL 4158925, at *3.  This time, petitioner told Malave to "close her ears, she was gonna hear something loud."  Id.  At the same time, petitioner handed the gun to Falls and instructed him to shoot at the group of Latin Kings.  Id.  Petitioner shouted "King killer" and "Maniac love" from the car, (Dkt. 10-1, pg. 105), while Falls fired five shots, with one of the bullets killing the victim. *Czech*, 2016 WL 4158925, at *3.

Four days later, the police arrested a different man, Daniel Garcia, for the shooting.  Id. Garcia, who knew petitioner and the others involved, told the police that he had heard petitioner admit to his involvement in the shooting.  Id.  This led the police to bring petitioner, Mejia, Malaves, and Falls in for questioning.  Id.  Petitioner confessed to the shooting in a statement to the police, and in a videotaped statement made to an assistant state's attorney.  Id.

Falls[3] and Malaves, as well as witnesses who were standing among the group on the sidewalk during the drive-by shooting, testified for the prosecution at trial.  Id. at *3.  Petitioner's confessions were also presented to the jury.  Id. at *2.[4]  At the completion of trial, the jury found petitioner guilty of murder and unlawful possession of a firearm.  Id. at *1, *3.

---

3 Both Falls and Mejia were tried separately from petitioner.  Falls was tried as a juvenile and was found guilty of first degree murder for his participation in the murder.  Id. at *3.  Mejia was tried as an adult, and was convicted of first degree murder and aggravated discharge of a firearm. Mejia v. Hulick, No. 06 C 0384, 2007 WL 1317131 (N.D. Ill. May 1, 2007) (Lefkow, J.) (denying petition for writ of habeas corpus), denying certificate of appealability sub nom., Mejia v. McCan*n*, No. 07-2347 (7th Cir. Dec. 10, 2007).

4 Chicago Police Department Detective Barbara Healy, who obtained petitioner's first oral confession, related the confession during her in-court testimony. It appears that Detective Healy did not attempt to record the first confession. Following petitioner's first confession, a second

4

2.     **Petitioner's Claim**

Petitioner's instant claim is that his murder conviction cannot stand because the jury was instructed on an impermissible felony murder theory in addition to being instructed on the elements of Illinois's murder statute, 720 ILCS 5/9-1. The jury was instructed that it should find petitioner guilty of murder if he: (1) intended to kill the victim; (2) caused great bodily harm to the victim or took an action that he knows would cause death to the victim; (3) knew that there was a strong probability of great bodily harm; or (4) the victim's death occurred during the course of committing a felony. (Dkt. 10-2, pg. 185). The fourth ground is the felony murder instruction and the relevant felony was aggravated discharge of a firearm. Id. The defense attorney did not object to the felony murder instruction and the jury returned a general verdict finding petitioner guilty of murder.

On direct appeal in the state court, petitioner argued that his trial counsel was ineffective for failing to challenge the felony murder instruction. The appellate court ruled that the felony murder instruction was improper under Illinois law,[5] but concluded there was no underlying error. The appellate court explained that the court presumes the jury convicted petitioner of the most serious crime charged; intentional or knowing murder. (Dkt. 10-4, pg. 60). Consequently, the

---

(cont…) confession, which was tape-recorded, was obtained by an ASA. The tape-recorded confession was played for the jury, but it was not transcribed in the trial transcripts. The state court opinion on direct appeal states that the videotape of the second confession was part of the record on appeal. However, respondent did not file a copy of the video in the present habeas corpus record. Regardless, the state appellate court opinion states that petitioner confessed to the detective, and a second time in a recorded videotape statement given to the ASA. Petitioner does not challenge these facts or otherwise attempt to challenge the presumption of correctness of these findings.

5  Respondent claims that the state court erred in holding that the felony murder instruction violated Illinois law, but concedes that the court is bound by the Illinois court's interpretation of Illinois law on this point.

state court concluded that the error in the felony murder instruction was harmless because the jury convicted petitioner under the intentional or knowing murder charge instead of felony murder. Id. Because any error was harmless, petitioner could not raise a Strickland violation for counsel's failure to challenge the felony murder instruction.

In considering petitioner's claim in the August 3, 2016, opinion, this court addressed two preliminary matters before turning to the underlying claim. First, the court noted that the parties had both briefed the underlying general verdict issue, when petitioner had raised a Strickland claim in the state courts. Czech, 2016 WL 4158925, at *8. Because respondent did not raise a procedural default defense as to the general verdict claim, the court proceeded to the general verdict issue briefed by the parties. Eichwedel v. Chandler, 696 F.3d 660, 669 (7th Cir. 2012) (instructing that procedural default is an affirmative defense which is forfeited if not properly asserted before the district court).

Second, the court questioned whether petitioner's claim was governed by the limitations of 28 U.S.C. § 2254(d) of the Antiterrorism and Effective Death Penalty Act because the state appellate court did not consider petitioner's constitutional claim that the inclusion of the felony murder instruction with the use of a general verdict form violated his due process rights. Czech, 2016 WL 4158925, at *8. Instead, the state court applied a principle of state law when it concluded that the jury convicted petitioner of the most serious charge of intentional or knowing murder. Id. This court recognized that this raised the question of whether the § 2243 law and justice / de novo standard instead of the § 2254(d) standard should apply to the claim. Id. The court declined to resolve the issue because the state court ruling was contrary to clearly established

precedent from the United States Supreme Court, satisfying the more demanding § 2254(d) standard. Id.

Turning to the underlying claim, this court explained that the state court ruling was best understood as an application of the common law principle that a verdict is valid so long as it is legally supportable by one of the grounds submitted to the jury even if an impermissible ground was also submitted. Id. at *9 (citing Griffin v. United States, 502 U.S. 46, 49-50 (1991)). Despite the fact that the verdict was consistent with common law principles, that did not resolve petitioner's claim because it does not address the constitutional issue.

The clearly established precedent holds that a "'conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one.'" Id. at *10 (quoting Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam) (citing Yates v. United States, 354 U.S. 298 (1957); Stormberg v. California, 283 U.S. 359 (1931)). Accordingly, this court concluded that it was constitutional error when the jury was instructed on an improper legal theory and returned a general verdict that might have relied on the invalid theory. Id. Consequently, the state court ruling to the contrary violated clearly established federal law on this point.

The court then considered whether the error could have been harmless, noting that the state court did not recognize the constitutional error and, therefore, did not engage in the harmless error analysis required under Chapman v. California, 386 U.S. 18 (1967). Czech, 2016 WL 4158925, at *11. As a result, Brecht's substantial and injurious effect standard controlled the harmless error review of the claim before this court. Czech, 2016 WL 4158925, at *11 (citing Davis v.

Ayala, 135 S. Ct. 2187, 2198 (2015); 507 U.S. at 639; Sorich v. United States, 709 F.3d 670, 674-75 (7th Cir. 2013)). The court called for additional briefing on the Brecht issue.

**B.     Analysis**

    **1.     The Brecht Standard**

In Hedgpeth, the Supreme Court, citing Brecht, held that the error at issue in this case --- a general verdict that may have relied on an invalid legal theory --- is governed by harmless error when reviewed by a federal court concerning a habeas corpus petition. 555 U.S. at 61-62. Under Brecht, habeas corpus petitioners "'are not entitled to habeas relief based on [a] trial error unless they can establish that it resulted in 'actual prejudice.'" Davis, 135 S. Ct. at 2197-98 (quoting Brecht, 507 U.S. at 637; United States v. Lane, 474 U.S. 438, 449 (1986)). "A federal court may grant habeas relief on a trial error only when that error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Calderon v. Coleman, 525 U.S. 141, 145 (1998) (quoting Brecht, 507 U.S. at 637; Kotteakos v. United States, 328 U.S. 750, 776 (1946)). "There must be more than a 'reasonable possibility' that the error was harmful." Davis, 135 S. Ct. at 2198 (quoting Brecht, 507 U.S. at 637). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." O'Neal v. McAninch, 513 U.S. 432, 436 (1995). There is grave doubt when "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Id. at 435. "The Brecht standard reflects the view that a 'state is not to be put to the arduous task of retrying the defendant based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the

8

error.'" Davis, 135 S. Ct. at 2198 (quoting Calderon, 525 U.S. at 146)). But, the Brecht standard is less demanding than the Chapman harmless error standard used on direct appeal. Fry v. Pliler, 551 U.S. at 116 (citing 386 U.S. 18, 24 (1967)).

Occasionally, the Brecht issue is resolved by the jury returning a special verdict in addition to the defective general verdict. For example, in Berry v. Jacuez, the trial court, like the state court in this case, erred under state law when including a felony murder instruction as a possible basis for the jury to convict the defendant of murder. 644 Fed. Appx. 740, 741 (9th Cir. Mar. 8, 2016) (non-precedential opinion). The Ninth Circuit found that the error did not have a substantial and injurious effect on the jury's verdict because the jury made a special finding that the prisoner had acted with the requisite intent, demonstrating that the impermissible felony murder ground was not relied upon by the jury. Id. at 741 ("Because the jury found implied malice, the potential harm posed by the felony murder instruction never materialized. Any error was therefore harmless . . . ."); see also Tapia v. Roe, 189 F.3d 1052, 1056-57 (9th Cir. 1999) (failure to include a required jury instruction regarding "intent to encourage or facilitate the criminal offense" for aiding and abetting instruction was cured by the jury's special finding that the defendant "had or shared specific intent to kill."); Tenner v. Gilmore, 184 F.3d 608, 612 (7th Cir. 1999) (recognizing that a special verdict resolves the issue of whether a general verdict was premised on an impermissible ground because "the court [] can be confident that the facts as the jury believed them to be are a legally proper basis of conviction.").

A special finding from the jury is not the only way for the state to succeed under Brecht. In Roy v. Gomez, the Ninth Circuit held that a specific finding from the jury was necessary to demonstrate that the jury relied upon the proper legal theory. 81 F.3d 863, 867-68 (9th Cir. 1993)

9

(en banc), rev'd sub nom., California v. Roy, 519 U.S. 2 (1996) (per curiam). The Ninth Circuit concluded that it was "not free to evaluate the evidence and postulate what the jury would have found had it been properly instructed." Roy, 81 F.3d at 867. The dissent in Roy argued that the court must review the record to determine if a rational and properly instructed jury would have found the defendant guilty under the proper legal theory when performing the Brecht harmless error review. Roy, 81 F.3d at 870-71 (Wallace, J., dissenting).

On appeal, the Supreme Court agreed with the dissent. California v. Roy, 519 U.S. 2, 4 (1996) (per curiam). Accordingly, a special finding is not the only way to satisfy Brecht. When performing the Brecht review, the court must make a "*de novo* examination of the record as a whole in order to determine whether the error had substantial and injurious effect or influence in determining the jury's verdict." Jenkins v. Nelson, 157 F.3d 485, 496 (7th Cir. 1998); Brecht, 507 U.S. at 640 (Steven, J., concurring). Put another way, the question for the court, when reviewing the record as a whole, is whether a rational jury would have found petitioner guilty of murder if it had been properly instructed. Jenkins, 157 F.3d at 496 (citing Roy, 81 F.3d at 870 (Wallace, J., dissenting)).[6] In sum, if a review of the evidence demonstrates that a properly instructed rational jury would have found petitioner guilty under a legal theory of murder, petitioner was not prejudiced by the erroneous felony murder instruction.

---

6 In his supplemental reply brief, petitioner quotes extensively from Suniga v. Bunnell, 998 F.2d 664 (9th Cir. 1993), and Sheppard v. Rees, 909 F.2d 1234 (9th Cir. 1989). (Dkt. 33, pg. 5-7). Both cases are predicated upon the view that an erroneous jury instruction is not subject to harmless error review. Sheppard, 909 F.2d at 1237; Suniga, 998 F.2d at 670. These cases are in conflict with the intervening Supreme Court rulings in California v. Roy, 519 U.S. 2 (1996) (per curiam); Neder v. United States, 527 U.S. 1 (1999); and Hedgpeth v. Pulido, 555 U.S. 57 (2008) (per curiam), which all hold that a jury instruction error is reviewable under harmless error including the Brecht harmless error standard. Roy, 519 U.S. at 6; Neder, 527 U.S. at 4; Hedgpeth, 555 U.S. at 60-61.

## 2. The Application of Brecht to the Instant Case

### A. The Overwhelming Evidence of Petitioner's Guilt

Petitioner is not entitled to relief because the evidence of his guilt is overwhelming. See Brecht, 507 U.S. at 639 (finding defendant was not entitled to relief when applying Brecht standard because evidence supported defendant's guilt); Brown v. Rednour, 637 F.3d 761, 767 (7th Cir. 2011) (finding prisoner was not entitled to relief when applying Brecht standard because evidence of guilt was overwhelming). Accordingly, a properly instructed rational jury would have found petitioner guilty of murder under a proper legal theory. Jenkins, 157 F.3d at 496. Consequently, the erroneous felony murder instruction did not have "a substantial and injurious effect or influence in determining the jury's verdict" in the instant case. Brecht, 507 U.S. at 637.

As previously mentioned, the jury was instructed that it should find petitioner guilty of murder if he: (1) intended to kill the victim; (2) caused great bodily harm to the victim or took an action that he knows would cause death to the victim; (3) knew that there was a strong probability of great bodily harm; or (4) the victim's death occurred during the course of committing a felony. (Dkt. 10-2, pg. 185).. As previously discussed, the fourth ground instructing the jury on felony murder was improper because the felony at issue was the wrongful discharge of the murder weapon. A properly instructed jury would have considered only the first three grounds.

As described previously, the evidence at trial showed that petitioner, a member of the Maniac Latin Disciples street gang, intended to shoot at the Latin Kings, a rival street gang, in a drive-by shooting. Czech, 2016 WL 4158925, at *1. Malaves, who was present for the entire incident, testified that the original plan was for petitioner, his girlfriend, Malaves, and Mejia, to go

11

on a double date at the movies. Id. at *3. Malaves testified that petitioner changed the plan for the evening, instructing that the group was going to "cruise by the Kings." Id.

Petitioner also instructed the group to pick up Falls, a 13-year-old pee wee member of the Maniac Latin Disciples who had been hiding a gun for petitioner. Id. After picking up Falls, the group traveled to where Falls hid the gun so that he could retrieve it. Id. Falls then gave the gun to petitioner. Id. Petitioner then instructed Falls that he planned to shoot at the Latin Kings and that either he or Falls would do the shooting depending on which side of the car the rival gang members were standing. Id.

When the group first drove by the Latin Kings petitioner said "King love," and flashed Latin Kings gang signs. Id. The Latin Kings responded by saying "King love," and returning Latin King gang signs. Id. By flashing Latin King gang signs and shouting a Latin King greeting, petitioner was able to identify his target as Latin King gang members. Petitioner also pointed out Chino, a ranking Latin King member, further demonstrating his identification of the group as Latin Kings, and further working towards his stated goal of shooting at them. (Dkt. 10-1, pg. 146). By using the Latin King greeting and gang signs, petitioner lulled his targets into a false sense of security. This provided petitioner with the element of surprise when he drove around the block making the second pass at the Latin Kings. Petitioner further showed his intent to murder the Latin Kings when he shouted "King Killer" and "Maniac Love" from the car during the shooting. (Dkt. 10-1, pg. 105). All of this evidence demonstrated petitioner's criminal intent.

The evidence also demonstrated that petitioner led the shooting. Petitioner gave Falls the gun immediately before the shooting and directed Falls that either he or Falls would shoot at Latin

12

Kings depending on which side of the car the group was standing. Czech, 2016 WL 4158925, at *3. Additionally, petitioner directed Malave to "close her ears, she was gonna hear something loud." Id. In addition to the above evidence, petitioner confessed to the crime on at least three different occasions following the shooting: first to Daniel Garcia, who led the police to petitioner; again during questioning by the police; and for a third time in a videotaped statement given to the assistant state's attorney. Id.

This evidence demonstrated that petitioner was the leader of the drive-by shooting. There is no doubt that a properly instructed jury hearing the evidence would have convicted petitioner of murder under a proper legal theory. The fact that petitioner likely did not intend to kill the victim, an innocent bystander who was unaffiliated with the Latin Kings, is of no moment. Illinois applies the transferred intent doctrine --- sometimes referred to as "intent follows the bullet." Illinois v. Grib, No. 1-15-1702, 2016 WL 7323285, at *7 (Ill. App. Ct. Dec. 14, 2016). Petitioner is responsible for murdering the victim because his intent to kill the Latin Kings transferred to his unintended victim. Id. Poor marksmanship does not eviscerate intent.

Additionally, the fact that Falls shot the gun that killed the victim does not excuse petitioner's liability for his actions. The evidence clearly established that petitioner orchestrated the shooting and directed Falls to shoot at the Latin Kings. Illinois v. Jones, 69 N.E.3d 226, 234-35 (Ill. App. Ct. 2016) (quoting Illinois v. Brown, 557 N.E.2d 199, 207 (Ill. App. Ct. 1990) ("Illinois law does not draw a distinction between the perpetrator of an offense and one who is accountable for his conduct: 'the accountable defendant stands in the shoes of his accomplice.'").

Petitioner argued at trial, and again in his supplemental briefing, that Falls was the responsible party and that he was an innocent bystander. Although this might have been a

13

reasonable trial strategy made by competent counsel in light of the overwhelming evidence against petitioner, it is an argument that a rational jury would reject. At the time of the shooting, petitioner was a 20-year-old gang member. In contrast, Falls was a 13-year-old pee wee member. Falls held the gun on petitioner's behalf in the weeks leading up to the shooting as a way for him to earn "stars" in the gang. A rational jury would reject the suggestion that a 13-year-old pee wee gang member would be giving orders to a 20-year-old gang member.

Defense counsel's strategy to assign blame to Falls for the shooting might have been reasonable because the jury heard that Falls was the shooter and had been adjudicated delinquent of murder as a juvenile. Czech, 2016 WL 4158925, at *11. But, there is no evidence to show that Falls was the ringleader and petitioner was an innocent bystander as he claims.

### B. Petitioner's Supplement Briefing Arguments

Petitioner's arguments in his supplemental briefing do not change the fact that the overwhelming evidence was against him. In support of his argument that the jury likely convicted him under the improper felony murder theory, petitioner claims that the prosecutor emphasized the felony murder theory in closing arguments. He also argues that because there was insufficient evidence to support the other theories of murder the jury could have convicted based only on the felony murder theory. These arguments fail for several reasons.

First, the prosecutor did not emphasize felony murder as the primary theory of the case in closing argument as petitioner suggests. The prosecutor initially argued for the proper murder theories and presented felony murder only as a fallback argument. (Dkt. 10-2, pg. 147-48). After discussing the three permissible grounds and the associated evidence, the prosecutor stated,

"I submit that establishes that what happened out there was murder." Id. at 148. The prosecutor had made no mention of felony murder up to that point in the closing argument.

Introducing felony murder as a fallback option, the prosecutor argued that even if the jury gave petitioner "the benefit of any conceivable doubt to think well he didn't want anyone to get hurt; for some reason feel sorry for him," the jury could convict under felony murder. Id. The prosecutor then explained the felony murder charge. In the rebuttal closing argument, the prosecutor made no mention of felony murder, instead emphasizing the evidence demonstrating that petitioner intended to kill the Latin Kings. The prosecutor discussed the felony murder standard for a total of two pages of the trial transcript while the full closing and rebuttal argument spans 37 pages. (Dkt. 10-2, pg. 127-50, 159-73). The felony murder argument charge was a fallback argument. It was not the main thrust of the prosecution's case.

Further, the prosecutor's mention of felony murder has minimal relevance to the court's review of the evidence under the Brecht standard. As discussed above, the court's focus is on what a rational jury would have found if it had been properly instructed. Jenkins, 157 F.3d at 496. In fact, petitioner agrees with this standard. (Dkt. 31, pg. 7). A prosecutor's closing argument may help a reviewing court understand the prosecution's theory of the case and with it the evidence at trial, so the court considers them as part of the *de novo* review of the entire record. But, opening and closing arguments are not evidence, and the court's focus under the Brecht standard is on the *evidence* before a properly instructed rational jury.

As a second argument, petitioner suggests that the evidence is not overwhelming. He argues that Falls is not credible because Falls testified that petitioner directed him to retrieve the gun, while Malave testified that Falls alone directed Mejia to drive the car to the location where the

15

gun was stashed, and Falls retrieved the weapon on his own. (Dkt. 31, pg. 10). Petitioner further argues that Falls cannot be believed because he was inconsistent regarding whether he was in the front or back seat of the car, and whose idea it was for him to move to the front seat. These minor discrepancies do nothing to defeat the impact of the evidence against petitioner.

The court concludes, after reviewing the trial record, that the overwhelming evidence proved that petitioner was the mastermind of the shooting. It was petitioner who directed Mejia to pick up Falls. The fact that Falls had to direct the group to the gun, and that Falls got out of the car to get the weapon, is consistent with petitioner as the leader and Falls his subordinate. It is reasonable that Falls would be the only person to know where the gun was located because he hid it on petitioner's request. A reasonable jury would conclude that Falls was petitioner's errand boy who hopped out of the car to retrieve the gun that petitioner had asked him to hide until petitioner needed it.

Petitioner also argues that there is insufficient evidence that he: (1) intended to kill the victim; (2) caused great bodily harm to the victim or took an action that he knows would cause death to the victim; or (3) knew that there was a strong probability of great bodily harm. (Dkt. 31, pg. 11-15). The court is hesitant to find overwhelming evidence of either of the first two grounds, but, at the very least, there was overwhelming evidence that petitioner knew that there was a strong probability of great bodily harm from firing a gun at the Latin Kings. See Illinois v. Teague, 986 N.E.2d 149, 155 (Ill. App. Ct. 2013) (citations omitted) ("[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with intent to kill"). Although Falls was the person who shot the victim, petitioner is equally responsible.

Petitioner also argues that as a 13-year-old Falls did not likely appreciate the outcome of his conduct. (Dkt. 31, pg. 12). That argument hurts, rather than helps, petitioner. Falls' age and his potential for not fully understanding his actions helps to demonstrate that Falls was Petitioner's subordinate. This undermines petitioner's theory of the case that he was an innocent bystander and that Falls was the responsible party.

In sum, a properly instructed rational jury would have concluded that petitioner was the leader of the drive-by shooting that resulted in the victim's murder. The overwhelming evidence of petitioner's guilt would have resulted in a rational jury convicting petitioner under a proper murder theory. The fact that a properly instructed rational jury would have convicted petitioner under a proper legal theory means that the introduction of the improper felony murder theory did not result in "actual prejudice" to petitioner. Davis, 135 S. Ct. 2197-98; Brecht, 507 U.S. at 637. Thus, the error did not have a "substantial and injurious effect or influence on determining the jury's verdict." Brecht, 507 U.S. at 637. Accordingly, Claim Two is denied and petitioner's habeas corpus petition is denied.

C. **Certificate of Appealabilty**

Under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, the court must issue or deny a certificate of appealability when it enters a final order adverse to a petitioner. Petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. See Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). To make a substantial showing, petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed

further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quotation omitted). The court finds that such a showing has been made. Although the court ultimately concludes that the erroneous felony murder instruction resulted in harmless error, it finds that the issues presented deserve encouragement to proceed further and invite further consideration from the reviewing court.

Petitioner is advised that this is a final decision ending his case in this Court. If petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**D.      Conclusion**

Petitioner's habeas corpus petition [1] is denied on the merits. Any pending motions are denied as moot. The Court will issue a certificate of appealability. The Clerk is instructed to

enter a judgment in favor of Respondent and against petitioner. The Clerk shall also alter the docket to reflect that Respondent is Michael Melvin, Warden, Pontiac Correctional Center, and alter the case caption to *Czech v. Melvin*. Civil Case Terminated.

**ENTER:** March 24, 2017

**Robert W. Gettleman**
**United States District Judge**